**LEE LITIGATION GROUP, PLLC**
C.K. Lee, Esq.
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

---

SHANNON CAMPBELL,
*individually and as parent and guardian of S.D.R.*;
JESSICA DIONISE,
*individually and as parent and guardian of R.D.*;
MELISSA DESMOND,
*individually and as parent and guardian of A.D.*;
NATARSHA HARRIS, *individually and as parent
and guardian of N.C.H.*,
*on behalf of themselves and all others similarly situated*,

      Plaintiffs,

      **v.**

KIMBERLY-CLARK CORPORATION,

      Defendant.

**Case No.:**

**CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

---

## PRELIMINARY STATEMENT

1.    This Class Action Complaint seeks redress for Plaintiff parents and their Plaintiff

minor children for physical and financial injuries to resulting from the purchase and use of all

varieties of Huggies® Diapers ("Huggies" or "the Product," which includes all variants).

Huggies is manufactured by Defendant Kimberly-Clark Corporation ("Kimberly-Clark" or "Defendant").

2.      Below is an image of one variant of the Product:



3.      This action seeks redress for Plaintiffs individually and on behalf of all others similarly situated for deceptive acts and practices in connection with the marketing, advertising, and sale of Huggies, which Defendants' misrepresentations and deceptive omissions caused consumers to believe were safe.

2

4.     In reality, the Products are liable to cause severe burns in infants because (1) they contain a skin irritant known as Ahcovel and (2) Defendant has not instituted manufacturing safeguards to ensure that the proper amounts of Ahcovel are dispensed on diapers. Because the amount of Ahcovel on Huggies diapers is not properly regulated, they will cause burns whenever an infant has the misfortune of wearing a diaper with too much Ahcovel in it.

5.     Accordingly, Plaintiffs bring their claims under the consumer protection statutes of their respective states, alleging (1) violations of New York General Business Law ("N.Y. G.B.L.") § 349 and § 350 (2) Michigan Consumer Protection Act (MCL § 445.901. *et seq.*); (3) Georgia Fair Business Practices Act (O.C.G.A. § 10-1-390 *et seq.*); and (4) Virginia Consumer Protection Act (Va. Code Ann. § 59.1-196 *et seq.*).

6.     As a result of Defendant's design, manufacturing, and marketing of the Products, these caused significant injuries to the minor children Plaintiffs, as detailed below.  Accordingly, Plaintiffs also bring individual claims for defective design, manufacturing defect, and failure to warn under the laws of their respective states.

**JURISDICTION AND VENUE**

7.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a)(2)(A) because Plaintiffs and Defendant are of diverse citizenship and the matter in controversy exceeds seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

8.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B) whereby: (i) the proposed class consists of over 100 class members, (ii) a member of the putative class is a citizen of a different

state than Defendants, and (iii) the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs.

9.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in Texas.

10.     Pursuant to 28 U.S.C. § 1391(b)(1), this Court is the proper venue for this action because Defendant resides in this District.

## PARTIES

*Plaintiffs*

11.     Plaintiffs Shannon Campbell and her daughter S.D.R are citizens of the state of New York.

12.     Plaintiffs Jessica Dionise and her daughter R.D. are citizens of the state of Virginia.

13.     Plaintiffs Melissa Desmond and her daughter A.D. are citizens of the state of Michigan.

14.     Plaintiffs Natarsha Harris and her son N.C.H. are citizens of the state of Georgia.

15.     Plaintiffs would be willing to use Huggies again but cannot do so until such time as Defendant acknowledges and remedies the defect in the Products, as Plaintiffs cannot take the risk that their children will once again be injured.

*Defendant*

16.     Defendant Kimberly-Clark Corporation is a global consumer products manufacture organized under the laws of Delaware with its principal place of business at 351

Phelps Dr., Irving, Texas, 75038 and an address for service of process at CT Corporation System, 111 Eighth Avenue, New York, NY 10011.

## FACTUAL AND LEGAL ALLEGATIONS

### Plaintiffs' Experiences With Huggies

17.     Plaintiff Shannon Campbell gave birth to her daughter, S.D.R. in March 2021. She began using Huggies Little Snuggler diapers. But these caused serious burns on S.D.R. *See* **Exhibit 1**. Plaintiff Campbell was initially unsure of the cause, but she began to suspect it had something to do with the diaper.  And so, beginning May 10, 2021, Plaintiff Campbell began using Pampers-brand diapers instead.  The problem began to abate, but it took several months for the burns to disappear.

18.     Plaintiff Jessica Dionise gave birth to her daughter R.D. on March 26, 2021, and soon thereafter began using Huggies diapers for her.  Soon thereafter, chemical burns began to materialize in R.D.'s genital and rear end areas.  Plaintiff Dionise took R.D. to a medical provider who mistook the burns for an ordinary diaper rash and recommended that they be treated as such, with Bactroban, butt paste, and wipes to vigorously clean the affected area. However, the wipes caused the wounds to bleed, and so Plaintiff Dionise stopped this approach. *See* **Exhibit 2**, p. 9.

19.     The wounds deepened over the next few days and by April 10, 2021, Plaintiff Dionise had to take R.D. to the hospital to treat what had become a life-threatening skin ulcer with extreme scarring.   Doctors at St. Mary's Hospital discovered "several impressive deep sacral ulcers" with a "[h]igh risk for superinfection," making the wounds "very painful to touch."

**Exhibit 2**, p. 19. At various points, R.D. was given Ampicillin, Gentamicin, and Acyclovir. *See* **Exhibit 2**, pp. 7, 13.

20.     Doctors performed a spinal tap and other tests on R.D. in order to identify the source of the wound.  *See* **Exhibit 2**, p. 19.  They found that "[n]othing on imaging suggests deeper, anatomical issue."  At one point, the doctors asked Plaintiff Dionise whether she had been applying household cleaners to clean R.D., so serious were R.D.'s injuries.

21.     Images of R.D.'s scarring are attached hereto as **Exhibit 3**.

22.     R.D.'s injuries began to heal when Plaintiff Dionise switched to another brand of diapers, and they did not recur.

23.     Plaintiff Melissa Desmond gave birth to her daughter, A.D., on September 25, 2018, and initially used the Pampers diapers provided by the hospital.  A few months later, Plaintiff Desmond began using Huggies Little Snugglers and Huggies Snug and Dry.  Then, on May 4, A.D. began screaming in pain. While Plaintiff Desmond's husband had changed A.D.'s diaper only 40 minutes prior, he smelled that she had defecated and proceeded to change the diaper again.  After removing the old diaper, he observed that her genital and rear end areas were extremely red, as they had not been only 40 minutes earlier.  Images of the injuries are attached hereto as **Exhibit 4**. The injuries persisted into the next day, May 5, 2022, at which point A.D. was taken to Urgent Care, diagnosed with contact dermatitis, and prescribed an ointment. Plaintiff Desmond and her husband researched this problem online and learned that Huggies had a reputation for causing such injuries.  The switched to another brand and the problem did not repeat itself.

24.     Between June and August 2021, Plaintiff Natarsha's Harris's son N.C.H. was wearing Huggies diapers.  During this period, burns began to appear on N.C.H.'s genital and rear

end areas.  Plaintiff Harris took N.C.H. to a doctor and receiving a prescription cream.  She stopped using Huggies and the burns did not return.


## Plaintiffs' Experiences With Huggies Are Commonplace

25.     Plaintiffs' experiences with Huggies are far from unique.  Below is a sampling of complaints on circleofmoms.com[1]:

> My little girl got SUCH a bad rash while I was using Huggies diapers. Her skin in that area looked like it was peeling, cracked, and bleeding. It was horrible and I kept blaming myself for it. Maybe I wasn't changing her often enough? Not enough cream/powder? I didn't get it.  Then I spoke with a friend who told me that she knew someone with the same problem with her little girl and the rash went away with a brand change. I was curious and went to a no name that I hated because it leaked. I automatically switched to Pampers and the rash disappeared overnight.

> Yes, in fact I called Huggies and complained to them because of the severe diaper rash my little girl has developed. Thanks for the post, it was very helpful!

> my sons both got rashes from huggies and i find that both my kids leakes super easily with huggies now i only buy pampers except the huggies pull ups my son likes the cars pull ups

> yes i wouldnt touch huggies at all my wee girls bum blistered with them!! im not keen on pampers either though because they always leaked on me.

> We switched from Pampers to Huggies when my son was seven days old. He got a rash so bad it was bleeding; diaper rash cream only helped a little bit. I read this post and subsequent comments and we immediately switched back to Pampers. Within a day it has already started getting better and he isn't screaming with every diaper change. We will definitely be sticking with Pampers from here on out!

> MY SON IS HAVING THE EXACT SAME REACTION TO HUGGIES!!!! I thought it was just my son! I know that they can develop sensitivities to diaper brands but not this bad. Good to know it's not just my son's bottom!

> im in new zealand and i had this with our huggies.as soon as we change brands it went away like over night

> yes i had the same problem with my daughter 5months and 2weeks,with huggies diapers my baby is just recovering from that ( peeling, cracked, and bleeding) will not go back to using huggies again!

---

[1] https://www.circleofmoms.com/moms-under-30-1/huggies-diaper-rash-536781

26.     In the same vein, commenters on community.babycenter.com[2] relate:

When my DD *(dear daughter)* was that age, we found a great deal on a pack of huggies. Most regrettable diaper purchase ever. Less than an hour of wearing one and she started screaming. Horrible red rash all over privates and bum. We never used huggies products since.

I had to switch DD *(dear daughter)* from Huggies Snug and Dry because it caused a HORRIBLE rash in just a matter of days. It could be a coincidence that your daughter is getting it right as you changed diapers, but that's what it was for mine.

This sounds just like a reaction one of mine had to Huggies. We switched to Pampers and had no more problems.

I absolutely hate Huggies I have been using pampers baby dry since my 20 year old son was born Huggies gave him a raw diaper rash I use pampers baby dry and my daughter has never had a diaper rash I use pampers overnight diapers at night and never had a leak I'm definitely a pampers mom tried and true

27.     We find more of the same on Amazon.com, where verified purchasers of Huggies

write:

Create severe diaper rash on my 2year old. I usually use pampers and I decided to go with huggies due to price difference but in my case, even though I change diaper very frequently and as I notice some pee, after 1 week of use my son developed really bad diaper rash. This is the second time it happened. Since I tried huggies when he was younger he hot diaper rash, I wasn't sure if that's because of diaper brand/type at the time, but I went back to pampers swaddlers. This time I thought I hive this a try again but same exact thing happened after a week of use. I don't recommend this diapers I think some material in there is causing these reactions which I would never want on my baby.[3]

I just cannot believe the lack of quality I received from a Huggies brand diapers. These are just awful, I've always trusted Huggies for both my children I usually buy the little movers from Costco. And this time I'm wishing I spent a little more for the better quality. I just don't understand how two products from the same company can be so different, especially when it's meant for such delicate skin. These diapers are so thin they leak terribly, and they've given my daughter an awful rash in the area where her inner leg rubs against the diaper, no wonder they've made an improvement with the little movers specifically for this problem. But why not just discontinue such a terrible product? Don't waste your money.[4]

---

[2] https://community.babycenter.com/post/a67692019/diaper-rash-from-huggies
[3] https://www.amazon.com/HUGGIES-Snug-Diapers-Count-Packaging/product-reviews/B00BCXF7MU/ref=cm_cr_othr_d_paging_btm_3?pageNumber=3&reviewerType=all_reviews

[4] https://www.amazon.com/HUGGIES-Snug-Diapers-Count-Packaging/product-reviews/B00BCXF7MU/ref=cm_cr_othr_d_paging_btm_3?pageNumber=3&reviewerType=all_reviews

We hated these! My 1 year old has never had diaper rash until we tried these a few weeks ago. Since then shes broken out a few times. These have leaked in 2 hours, pampers can go all night without leaking. Poop even leaked out the side when she didn't even poop that much. As soon as she pees in the huggies you can smell pee. We liked the huggies they used at the hospital but these ones were terrible. Will be going back to pampers for sure.[5]

These don't even deserve 1 star honestly, they all have broken apart after one urination. My one year old daughter went down for a nap happy, healthy and woke up covered in a blistered rash from the diaper breaking apart while she slept. I changed from luvs to huggies, I used 5 diapers in total between my 1 year old and 2 year old, before tossing the rest in the trash!!! Huggies should not sell diapers anymore![6]

I don't know what happened to Huggies Snug and Dry, but the new version is horrid. My baby would wake up with tiny pieces of glue or whatever the material that they are using now on his skin, this is only after 6-7 hs of wear at night. The sticky substance that supposed to be inside the diaper somehow leaks and ends up on baby's skin and eventually irritates and you have a diaper rash or worse. Don't buy. Even though it's cheaper, but not worth the irritation of baby's skin.[7]

Absolutely very poor quality and wouldn't suggest to use this for your baby. The material was peeling off, developed rashes on the baby and we have to rush to the enemy as a result. Second experience with this little snuglers and I surely won't recommend it! Not worth!![8]

Good diapers. Fit good BUT whatever chemicals huggies uses in their brand has always broke out all of my grandbabies when they used them..but I thought I would give them a try again .. and Again.. he breaks out with a bad rash everytime we use huggies.. so I had to order luvs brand.[9]

My 11 month old daughter has been fighting horrible diaper rash/ burns lately. She has never had problems in the past. I finally thought maybe it's the diapers!! This all started after she started wearing these. I came to check the reviews to see if others have had similar problems. I see lots of claims that this is a bad batch. This is the first time I have bought this type of diaper so I don't have another batch to compare them to but I will say that I won't be repurchasing them. I have noticed the funny chemical smell that several

---

[5]                         https://www.amazon.com/HUGGIES-Snug-Diapers-Count-Packaging/product-reviews/B00BCXF7MU/ref=cm_cr_othr_d_paging_btm_4?pageNumber=4&reviewerType=all_reviews
[6]                         https://www.amazon.com/HUGGIES-Snug-Diapers-Count-Packaging/product-reviews/B00BCXF7MU/ref=cm_cr_othr_d_paging_btm_5?pageNumber=5&reviewerType=all_reviews
[7]                         https://www.amazon.com/HUGGIES-Snug-Diapers-Count-Packaging/product-reviews/B00BCXF7MU/ref=cm_cr_othr_d_paging_btm_5?pageNumber=5&reviewerType=all_reviews
[8]                         https://www.amazon.com/Huggies-Little-Snugglers-Diapers-Size/product-reviews/B00HB0WGAY/ref=cm_cr_getr_d_paging_btm_next_23?ie=UTF8&reviewerType=all_reviews&pageNumber=23
[9]                         https://www.amazon.com/Huggies-Little-Snugglers-Diapers-Size/product-reviews/B00HB0WGAY/ref=cm_cr_getr_d_paging_btm_24?ie=UTF8&reviewerType=all_reviews&pageNumber=24

others complained about. I'm convinced now that the diapers have a lot to do with all of our problems.[10]

Diapers were either bad or fakes that they caused my baby to have a diaper rash. This was my first time purchasing diapers through Amazon and I was highly disappointed. Since we started using them the moment my daughter would urinate I the diapers would release a weird chemical like smell. I started paying closer attention to it and I confirmed they were bad by the second day when my daughter got a diaper rash. Yes, by the second day. I then looked to read other reviews and found that I was not the only one who had the same experience. I would take very big precaution when purchasing.[11]

28.     The same points are reiterated in customer complaints on *Huggies's very own website*.  On dissatisfied customer wrote as recently as the latter half of July 2018:

I bought the snug and dry diapers for my toddler 2 months ago through Amazon subscription. I was excited bc it was a great savings compared to the luvs we were buying from Walmart. He never has a diaper rash, but I started noticing his bottom stayed red all of sudden and he would cry (sometimes scream) when I changed him. It seemed odd but I hadn't even thought it may be the diapers.

Well we ran out before the next shipment [sic] came and so we bought our usual luvs. He had zero issues with a diaper rash during this time.

The next box arrived last week. After just 2 days of using the huggies again his bottom is bright red! He screams when he soils the diaper. He screams when we change and bathe him so much that his little body is shaking! It is absolutely the diapers causing the rash! I'm have about 160 diapers left and I'm throwing them out!![12]

29.     And here is a sample of recent complaints on the Walmart site:

**Gave my twins burns**
My favorite brand was out of diapers so I used Huggies snug and dry as a quick fix and they gave both babies bad bad bad burns and rashes it took us over a month to get it to go away after we stopped using Huggies snug and dry. I would not recommend these diapers unless you want a baby screaming in pain from their diaper rash.[13]

---

[10]          https://www.amazon.com/HUGGIES-LITTLE-Diapers-ECONOMY-Packaging/product-reviews/B00HB0WGF4/ref=cm_cr_getr_d_paging_btm_next_6?ie=UTF8&reviewerType=all_reviews&pageNumber=6

[11]          https://www.amazon.com/HUGGIES-LITTLE-Diapers-ECONOMY-Packaging/product-reviews/B00HB0WGF4/ref=cm_cr_getr_d_paging_btm_next_11?ie=UTF8&reviewerType=all_reviews&pageNumber=11

[12] https://www.huggies.com/en-us/diapers/snug-and-dry?WT.mc_id=HUG_Paid-Search_Gen18_EN-US_HUG-G&WT.srch=1&ReferralCode=HUG-GENENU-PA-OGI-20180401

[13] https://www.walmart.com/reviews/product/43848328?sort=submission-desc

**Awful Rash**

I bought a large box of these diapers. Within a week, my son has developed an awful, chemical burn-like rash. We took him to the doctor and they prescribed a medication. He developed an allergic reaction to that medication and we were instructed to stop the medication and had to be taken to the hospital as the rash turned into an infection. Huggies sent a gift card but that does not help when I have accumulated a ton of bills due to these diapers. My situation was completely dismissed and I am highly upset. Please, Google Huggies Snug N Dry to see all the testimonies from parents dealing with this exact situation. DO NOT BUT THESE!![14]

**DONT BUY!!!**

I'd rate negative if I could! My son is a year old and we recently went up to a size 6 in diapers. We switched from Luvs to Huggies Snug and Dry because they were a better price per diaper for bulk buy. Within 3 days my son has developed a horrible rash on his nether regions and he has NEVER had a diaper rash before. Not even when sick or had watery stool. Now he is screaming in pain everytime I change his diaper or bathe him. Apparently this is a common issue with Huggies Snug and Dry. I was not aware of the Huggies Snug and Dry issue until I started researching when this all started. I can not understand why a company would allow a product to be sold that is harming anyone let alone children! We had to go back to the store and buy a box of Luvs in hopes to stop further irritation and encourage healing.[15]

**Caused terrible rash**

I changed my daughter and an hour later she was screaming and crying. I couldn't figure out why till I took her diaper off and she had a bright red rash. She's never been sensitive to anything before and has never had a rash like this. She's so miserable. I looked it up and many people have had this problem. Nothing that can do this should be sold for babies[16]

**Bum rash!**

We love Mickey & have always been told Huggins are great. I noticed over the last 2 days of using these that my son has gotten a rash and his bum is bright red. Someone on my mom group posted about taking their baby to the pediatric and they said it's the diapers causing chemical burns and this is exactly what is happening to my son as well. SO disappointed in this brand![17]

---

[14] https://www.walmart.com/reviews/product/43848328?sort=submission-desc
[15] https://www.walmart.com/reviews/product/43848328?sort=submission-desc&page=2
[16] https://www.walmart.com/reviews/product/43848328?sort=submission-desc&page=2
[17] https://www.walmart.com/reviews/product/43848328?sort=submission-desc&page=3

**True Causes of Huggies-Induced Rashes and Burns**

30.    Defendant has always feigned shock and bewilderment in responding to complaints about the Products, professing complete ignorance as to the underlying cause of the injuries complained of by consumers. As far back as 2013, Defendant responded to their concerns as follows:

> Hello Huggies Parents,
>
> As some of you may have heard, a concern about one of our diapers causing irritation was raised recently on Facebook. We take any concerns about our diapers very seriously, and we are working directly with this mom to learn more about what happened and how we can help. Nothing is more important than the safety of the little ones who use our products.
>
> Families put their trust in Huggies diapers every day, and all of our Huggies diapers have been thoroughly evaluated to ensure they are safe. As parents ourselves, we know you may have additional questions or concerns. Please don't hesitate to contact us at http://bit.ly/8ZuAUH[18]

31.    Defendant has repeated the same refrains to this day, reassuring concerned parents that nothing in Huggies diapers could have possibly caused all these injuries.  For example:



---

[18]      https://www.facebook.com/huggies/posts/hello-huggies-parentsas-some-of-you-may-have-heard-a-concern-about-one-of-our-di/10151828209894387/

32.     Defendant reassures parents that Huggies "can't cause chemical burns because they're made of materials that which do not create any chemical reactions."  However, the Declaration of former Kimberly-Clark engineer and quality control specialist Frank Fritz Kromenaker ("Kromenaker Decl.," attached as **Exhibit 5**) explains why this is a flat-out lie.

33.     Mr. Kromenaker observes that Ahcovel is a chemical additive employed in a wide range of Kimberly-Clark products, including Huggies.  It is listed, for example, in Defendant's patent for "improved fastening systems," used in all Kimberly Clark diapers. Kromenaker Decl. ¶ 16, **Exhibit A**.

34.     Ahcovel is applied to the surface of products designed to absorb urine or blood— e.g., diapers or tampons.  Ahcovel is not itself an absorbent material, but it interacts with the urine or blood in order to render them more absorbable by the absorbent material.  Without it, an infant's urine might not pass through the outer lining of a diaper to be absorbed by the material underneath it, thus leaving the infant wet.   *See* Kromenaker Decl. ¶ 16

35.     However, Mr. Kromenaker observes that Ahcovel is a skin irritant that can cause serious injury when applied in sufficient quantity.  This is acknowledged by Defendant itself in internal documents such as its Safety Data Sheet for its "Absorbent Core Composite" (Sec. 11, "Toxicological Information"), *see* Kromenaker Decl ¶ 17, **Exhibit B**,[19] and its Standard Test Methods (STM) EQ-STM-4210 / 1 (Sec. 1.3), *see* Kromenaker Decl. ¶ 18, **Exhibit C**,[20] both of which acknowledge that Ahcovel can cause skin irritation.

36.     However, Kimberly-Clark does not actually ensure that the level of Ahcovel in Huggies is safe because it does not rigorously inspect, test, or maintain the instruments that dispense it (not only on Huggies but across many product lines).  These instruments are not

---

[19] Highlighting is by Plaintiff.
[20] Highlighting is by Plaintiff

tested or properly calibrated when first installed, when modified, or at regular intervals over their lifetime of use. As a result, Huggies diapers frequently cause skin irritation in infants, because the quantity of Ahcovel sprayed thereon has not been properly monitored or controlled.

37.     Mr. Kromenaker knows this from direct experience as a quality assurance inspector. *See* Kromenaker Decl. ¶¶ 21-23.  It is also demonstrated by internal documents that Mr. Kromenaker has produced.  For example, Mr. Kromenaker observes that the "Verification and Calibration" section on Defendant's Standard Text Method form was removed and that this prevented the proper calibration of Defendant's manufacturing equipment. *See* Kromenaker Decl. ¶¶ 21-23, **Exhibit C**.   The same is betrayed by Defendant's Quality Management Assessing Rating Tool, or "QMART," from which the "testing column" was removed.  Without testing, Defendant cannot assure that the Products conform to design specifications, because it cannot assure that the proper amount of Ahcovel is being dispensed. Kromenaker Decl. ¶¶ 25, **Exhibit E**. Indeed, Defendant's own internal audit observed that "[e]quipment calibration and maintenance is not being managed in a manner to ensure accurate performance" and that there were "[c]oncerns related to precision and validation." Kromenaker Decl. ¶ 26, **Exhibit F**.

38.     As Mr. Kromenaker observes, Defendant's lax quality assurance protocols is also betrayed by the many warnings and reprimands Defendant has received from the Food and Drug Administration ("FDA").   One FDA warning letter identified a "[f]ailure to establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality."  The letter also noted that the specific violations highlighted therein "may be symptomatic of serious underlying problems in your establishment's quality system."  Kromenaker Decl. ¶ 28, **Exhibit G**.

39.     Over ten years later, another FDA reprimand noted the same problems, confirming what Mr. Kromenaker already knew from direct experience.  The citation observed, *inter alia*, that "[t]he design was not validated under defined operating conditions using initial production units, lots or batches or their equivalents."   Kromenaker Decl. ¶ 30, **Exhibit H**.

40.     Attempting to confuse the public, Kimberly-Clark has publicly proclaimed that the safety of the "superabsorbent materials" in its diapers is vouched for by hundreds of consumer safety tests and studies:

> The Superabsorbent materials (SAM) found in HUGGIES diapers is being used in virtually all disposable diapers on the market today.
>
> Superabsorbent materials (SAM), also known as polyacrylate absorbents, are a family of polymers that have extraordinary absorbency --- the particles will absorb up to 100 times their weight in moisture. The safety of superabsorbent material has been proven in more than 450 consumer safety tests that have studied every way a person could come in contact with it ---through skin contact, ingestion or even inhalation. Each study has consistently demonstrated the safety and efficacy of this material.
>
> The crystals in the diaper are forms of a superabsorbent material that's been used in diapers for many years. The superabsorbent material looks like a tiny bead when it's dry and looks like a gel when it's wet (and mixed with the other fluffy fibers in the diaper).
>
> Superabsorbent material in diapers offers significant benefits, like drawing wetness away from baby's skin and helping to keep baby's skin healthy. In HUGGIES diapers, superabsorbent material is mixed with the fluffy diaper padding. This material turns liquid into a gel, helping to prevent leak age. Occasionally, you may see small beads of gel on the diaper or on your baby, but the gel is nontoxic and not harmful.[21]

41.     However, the information presented by Mr. Kromenaker shows that Defendant is attempting to misdirect from this real issue.  The cause of the burns and rashes produced by Huggies is not the "superabsorbent materials"—the materials urine is ultimately absorbed *into*— but the Ahcovel that makes urine *absorbable* in the first place.  The skin of Huggies wearers does not normally come into contact with polyacrylate absorbents.  But it does come into contact with Ahcovel, which is sprayed on these absorbents' outer lining and allows urine to permeate

---

[21] http://www.truthorfiction.com/rumors/h/Huggies-Diaper-Burns.htm#.UtAjnJ5dV8E

that lining.  While polyacrylate absorbents may be universal across all diaper brands, Ahcovel is proprietary to Defendant.

42.     The improperly regulated use of Ahcovel in the Products explains Plaintiffs' injuries and, more generally, the large number of consumer complaints about the Products, a small sampling of which is reproduced above.  It also explains why so many of these problems began with a brand switch to Huggies and ended with a brand switch away from them.

**Defendant's Actionable Conduct**

43.     Defendant is in the business of developing, designing, manufacturing, marketing, advertising, and distributing Huggies diapers and other personal care and cleaning products to consumers.  Huggies is among the top-selling diapers in the country and is sold in supermarkets, convenience stories, and pharmacies throughout the United States.

44.     Through its advertising and marketing, Defendant promoted and continues to promote Huggies as being safe and comfortable for infants.  The Product website states, for example, that Huggies diapers "are made without harsh ingredients" and that Little Snugglers are "Our perfect diaper for gentle skin protection."[22] Whether or not they viewed these specific representations, Plaintiffs and the Class did, and a reasonable consumer would, expect the Product to be safe and comfortable for infants.

45.     Reasonable consumers might expect that any diaper is liable to cause mild rashes in infants on occasion, but they would not expect the Product to cause extreme chemical burns that lead to doctors' visits and weeks or months of recovery time.

---

[22] https://www.huggies.com/en-us/diapers

46.     The reviews above are by parents who are familiar with the normal travails of diaper use.  Thus, their complaints indicate a problem that is out of the ordinary.

47.     Plaintiffs and Class members were misled into purchasing an unsafe product, which did not provide the attributes and benefits that they reasonably expected to receive and believed they were receiving.  As a result of Defendant's negligent manufacturing process and deceptive acts and practices, Plaintiffs and Class members purchased a product that was not safe for its intended use and so did not offer the qualities for which it had been advertised.

48.     Defendant failed to warn consumers that the Product carried the unreasonable dangers of chemical burns from Ahcovel.

49.     Defendant owed a legal duty to Plaintiffs and Class members to exercise reasonable care by developing, manufacturing, and marketing a product that was safe for its intended use.  Defendant knew or should have known that its failure to ensure reasonable safety standards would cause serious pain and injury to vulnerable infants.  It was unreasonable for Defendant to use Ahcovel in the Products given that (1) safer alternatives were available, as illustrated by other diaper brands, and (2) Defendant was unprepared to devote significant resources to ensuring that the correct amount of Ahcovel would be dispensed on diapers.

50.     Plaintiffs and Class members would not have purchased the Products had they known it carried these dangers.

51.     Plaintiffs and Class members had no way of independently discovering that Defendant's design and/or manufacturing process assigned little importance to infant health and safety.

52.     Defendant breached its duty to consumers. This breach directly and proximately resulted in Plaintiffs and other Class members suffering injury in fact, physical injury and suffering, financial injury, the personal expenditure of time and resources, and mental anguish.

53.     Plaintiffs and the Class did not know, and had no reason to know, that the Products contained an inadequately regulated skin irritant. Plaintiffs and Class members would not have purchased the Products at the given price had they known the truth. Because the Products were inferior to what had been represented to them, Plaintiffs and Class members were deprived of the benefit of their bargains, injured in an amount up to the purchase price, to be determined by expert testimony at trial.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs seeks to represent a class consisting of:

All persons or entities who purchased the Products in the United States during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Nationwide Class")

55.     Should the Court not certify a Nationwide Class, Plaintiffs, in the alternative, seek to represent state-wide classes for each of their respective states:

56.     Plaintiffs Shannon Campbell and S.D.R. seek to represent the following class:

All persons or entities who purchased the Products in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class")

57.     Plaintiffs Jessica Dionise and R.D. seek to represent the following class:

All persons or entities who purchased the Products in Virginia during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Virginia Class")

58.     Plaintiffs Melissa Desmond and A.D. seek to represent the following class:

All persons or entities who purchased the Products in Michigan during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Michigan Class")

59.     Plaintiffs Natarsha Harris and N.C.H seek to represent the following class:

All persons or entities who purchased the Products in Georgia during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the Georgia Class")

60.     The proposed Classes exclude current and former officers and directors of Defendant, members of the immediate families of the officers and directors of Defendant, Defendant's legal representatives, heirs, successors, assigns, and any entity in which it has or has had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

61.     Plaintiffs reserve the right to revise Class definitions based on facts learned in the course of litigating this matter.

62.     Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, there are clearly hundreds of thousands, if not millions, of Class members, given the scale of Defendant's operations. Other Class members may be notified of the pendency of this action by mail or by advertisement, using the forms of notice customarily used in class actions such as this.

63.     Plaintiffs' claims are typical of the claims of other Class members, as all Class members are similarly affected by Defendant's wrongful conduct.

64.     Plaintiffs will fairly and adequately protect the interests of Class members in that Plaintiffs have no interests antagonistic to those of other Class members.  Plaintiffs have retained experienced and competent counsel.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for them to individually seek redress for the wrongful conduct alleged herein. If class treatment of these claims were not available, Defendant would likely unfairly receive hundreds of thousands of dollars or more in improper earnings.

66.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Questions of law and fact common to all Class members include:

    i.   whether Defendant made misrepresentations and/or deceptive omissions concerning the safety of the Products;

    ii.   whether Defendant's marketing, promotion and advertising of the Product is false, fraudulent, deceptive, unlawful or misleading;

    iii.   whether Plaintiffs and Class members sustained injuries or damages as a result of Defendant's false advertising of the Product;

    iv.   whether Plaintiffs and Class members are entitled to equitable relief and prospective injunctive relief enjoining Defendant from continuing to engage in the fraudulent, deceitful, unlawful and unfair common scheme as alleged in this Complaint; and

    v.   whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the

amount of such damages and/or their ratio to the actual or potential harm to Class members.

67.     The prosecution of this action as a Class action will reduce the possibility of repetitious litigation. Plaintiffs know of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual class member are too small to make it economically feasible for an individual class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will avoid the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

69.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.

70.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

71.     The prosecution of separate actions by Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.

72.     Defendant's conduct is generally applicable to the Classes as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Classes as a whole. Accordingly, Defendant's systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

## CAUSES OF ACTION

## COUNT I

**VIOLATIONS NEW YORK DECPETIVE TRADE PRATICES ACT**
**(N.Y. GBL § 349)**

**(brought by Plaintiff Campbell on behalf of herself and either the New York Class or the New York SubClass of the Nationwide Class)**

73.     Plaintiff Campbell realleges and incorporates by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

74.     Plaintiff Campbell brings this claim individually and on behalf of the other members of the New York Class or New York SubClass of the Nationwide Class for violations of NY GBL § 349.

75.     Defendant's conduct and/or omissions as alleged herein constitute deceptive acts or practices under NY GBL § 349, which was enacted to protect the consuming public from those who engage in unconscionable, deceptive or unfair acts or practices in the conduct of any business, trade or commerce.

76.     Defendant's deceptive acts, omissions and practices were directed at consumers. Defendant's actions impact the public interest because Plaintiff Campbell and Class members were injured in exactly the same way as thousands of others purchasing the Product.

77.    Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

78.    Defendant has misled Plaintiff Campbell and Class members into purchasing the Products by failing to disclose the unusual risks created by the Ahcovol in the Products.

79.    Defendant knowingly and falsely represented that the Product was fit to be used for the purpose for which it was intended when it knew that the Product was defective and dangerous.

80.    Defendant's misrepresentations and nondisclosure of material facts constitute unconscionable commercial practices.

81.    The foregoing deceptive acts, omissions and practices set forth in connection with Defendant's violations of NY GBL § 349 proximately caused Plaintiff Campbell and other Class members to suffer damages in the form of, *inter alia*, monies spent to purchase the Product. Plaintiff Campbell and other Class members are entitled to recover compensatory, statutory, and punitive damages, as well injunctive relief and attorneys' fees and costs.


## COUNT II

**VIOLATIONS OF NEW YORK FAIR ADVERTISING LAW**
**(N.Y. GBL § 350)**

**(brought by Plaintiff Campbell on behalf of herself and either the New York Class or the New York SubClass of the Nationwide Class)**

82.    Plaintiff Campbell realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

83.    Plaintiff Campbell brings this claim individually and on behalf of members of the

Class, for violations of NY GBL § 350.

84.    Defendant has been and/or is engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

85.    New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

86.    Defendant caused to be made or disseminated throughout New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known to Defendant, to be untrue and misleading to consumers and the Class.

87.    Defendant's deceptive representations and failures to disclose as alleged herein were material and substantially uniform in content, presentation, and impact upon consumers at large.

88.    Defendant has violated N.Y. Gen. Bus. Law § 350 because its false and deceptive health claims were material and likely to deceive a reasonable consumer.

89.    Plaintiff Campbell and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

90.    Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff Campbell and Class members seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a (1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT III

### VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
### (MCL § 445.901. *et seq.*)

**(brought by Plaintiff Desmond on behalf of herself and either the Michigan Class or the Michigan SubClass of the Nationwide Class)**

91.     Plaintiff Desmond realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

92.     Defendant violated the Michigan Consumer Protection Act, MCL §§ 445.901. *et seq.* (the "MCPA") by employing "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." MCL §445.903(1).

93.     Specifically, Defendant "[r]epresent[ed] that [its] goods … have … characteristics, ingredients, uses, benefits, or quantities that they do not have." MCL §445.903(1)(c). Defendant also "fail[ed] to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." MCL §445.903(1)(s).

94.     Under the MCPA, "reliance and causation are satisfied by proof that plaintiffs purchased and consumed the product." *Gasperoni v. Metabolife*, 2000 U.S. Dist. LEXIS 20879, *20 (E.D. Mich. Sept. 27, 2000).

95.     "[M]embers of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations. It is sufficient if the class can establish that a reasonable person would have relied on the representations. Further, a defendant's intent to deceive through a pattern of misrepresentations can be shown on a representative basis under the Consumer Protection Act." *Dix v. American Bankers Life Assurance Co.*, 429 Mich. 410, 418 (1987).

96.     The purpose of the MCPA is to "provide an enlarged remedy for consumers who are mulcted by deceptive business practices," and it "should be construed liberally to broaden the consumers' remedy, especially in situations involving consumer frauds affecting a large number of persons." *Gasperoni*, 2000 U.S. Dist. LEXIS 20879, at *21.

97.     Defendant violated the MCPA when it marketed the Products at safe for infants and failed to disclose to consumers the risks and dangers created by Defendant's use of Ahcovel.

98.     Plaintiff Campbell and Class members are entitled to all appropriate, compensatory, statutory, and punitive damages, as well as reasonable costs and attorneys' fees.


## COUNT IV

### VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### (O.C.G.A. § 10-1-390 *et seq.*)

**(Brought by Plaintiff Harris on behalf of herself and the Georgia Class or the Georgia SubClass of the Nationwide Class)**

99.     Plaintiff Harris realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

100.    The Georgia Fair Business Practices Act ("FBPA") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions." O.C.G.A. § 10-1-393(a). This includes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." O.C.G.A. § 10-1-393(b)(5).

101.    The FBPA provides that "[a]ny person who suffers injury or damages… as a result of consumer acts or practices in violation of this part… may bring an action individually, but not in a representative capacity, against the person or persons engaged in such violations under the rules of civil procedure to seek equitable injunctive relief and to recover his or her

general and exemplary damages sustained as a consequence thereof in any court having jurisdiction over the defendant; provided, however, exemplary damages shall be awarded only in cases of intentional violation." O.C.G.A. § 10-1-399(a).

102.    While the FBPA does not provide for class actions, the Supreme Court, the 11th Circuit, and other courts have all held that state law restrictions on the bringing of class actions do not apply in federal court. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 400, 130 S. Ct. 1431, 1438 (2010) (F.R.C.P. 23 authorizes "class actions across the board" notwithstanding state law restrictions on class actions); *Dremak v. Iovate Health Scis. Grp., Inc. (In re Hydroxycut Mktg. & Sales Practices Litig.)*, 299 F.R.D. 648, 654 (S.D. Cal. 2014) ("[A]pplication of Rule 23 to Plaintiffs' [FBPA] claims does not run afoul of the Rules Enabling Act. Rule 23 governs Plaintiffs' claims, and Plaintiffs' claims are not subject to dismissal based on the state statutes prohibiting class actions."); *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015) ("The bottom line is this. The Alabama statute restricting class actions, like the New York statute at issue in Shady Grove, does not apply in federal court. Rule 23 controls.").

103.    The FBPA requires that a plaintiff have submitted a written demand for relief to defendant at least 30 days prior to the filing of any action "identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered." O.C.G.A. § 10-1-399(b).

104.    A written demand for relief was sent to Defendant at least 30 days prior to the filing of this action. It was sent on June 27, 2022. A reproduction of the letter and the USPS Certified Mail receipt are attached hereto as **Exhibit 6**.

105.     The FBPA provides that "a court shall award three times actual damages for an intentional violation." O.C.G.A. § 10-1-399(c).

106.     The FBPA also provides that a person injured by a violation of the FBPA "shall, in addition to other relief provided for in this Code section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and expenses of the litigation incurred in connection with said action." O.C.G.A. § 10-1-399(d).

107.     Defendant violated the FBPA by representing to consumers that its Products are safe and comfortable for infants thereby communicating that the Products have "characteristics, ingredients, uses, benefits, or quantities that they do not have." O.C.G.A. § 10-1-393(b)(5).

108.     Maintaining a claim under the FBPA also requires that the "plaintiffs' claim must involve matters of public interest or concern." *Buckley v. Directv, Inc*., 276 F. Supp. 2d 1271, 1274 (N.D. Ga. 2003). Defendant's deceptive advertising and labeling of its Products is a matter of public interest or concern because Defendant markets its Products to millions of Georgia residents and derives substantial revenues from sales of the Products in Georgia.

109.     Defendant violated the FBPA when it marketed the Products at safe for infants and failed to disclose to consumers the risks and dangers created by its use of Ahcovel.

110.     Plaintiff Harris and Class members are entitled to all appropriate, compensatory, statutory, and punitive damages, as well as reasonable costs and attorneys' fees.

## COUNT V

**VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT**

**(Va. Code Ann. § 59.1-196 *et seq*.)**

**(Brought by Plaintiff Dionise on behalf of herself and the Virginia Class or the Virginia SubClass of the Nationwide Class)**

111.    Plaintiff Dionise realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

112.    Defendant violated the Virginia Consumer Protection Act by "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits." Va. Code Ann. § 59.1-200(A)(1).

113.    The VCPA provides for a duty to disclose material information when "the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Circuit 1999).

114.    The VCPA provides for statutory damages: "Any person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages, or $500, whichever is greater. If the trier of fact finds that the violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater." § 59.1-204 (A)

115.    The VCPA also provides for reasonable attorneys' fees and court costs. § 59.1-204 (B).

## COUNT VI

## FRAUDULENT MISREPRESENTATION/CONCEALMENT

### (brought individually and on behalf of the Nationwide Class or, in the alternative, on behalf of each Plaintiff's state class)

116.    Plaintiffs reallege and incorporate herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further alleges as follows:

117.    A claim for fraudulent misrepresentation requires a plaintiff to allege "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury." *Mandarin Trading Ltd. v. Wildenstein*, 2011 NY Slip Op 741, ¶ 3, 16 N.Y.3d 173, 178, 919 N.Y.S.2d 465, 469, 944 N.E.2d 1104, 1108 (quoting *Lama Holding Co. v Smith Barney Inc*., 88 NY2d 413, 421, 668 NE2d 1370, 646 NYS2d 76 [1996]).

118.    Element #1 is satisfied because Defendant knowingly misrepresented to Plaintiffs and Class members, by either act or omission, that the Product is safe for infants.

119.    Element #2 is satisfied because these and other similar representations were made for the purpose of inducing the reliance of Plaintiffs and Class members.  Obviously, any parent would care a great deal about whether a product was safe and suitable for infants.

120.    Element #3 is satisfied because Plaintiffs' reliance on these deceptive representations and/or omissions was justified. They had no way of discovering that they were not true.

121.    Element #4 is satisfied because Plaintiffs suffered injury as a result of Defendant's misrepresentation.

122.     Defendant's conduct as described herein, including but not limited to its failure to provide adequate warnings, and its continued manufacture, sale, and marketing of the Product, which it knew was dangerous, evidences intentional disregard for the rights of Plaintiffs and warrant the imposition of punitive damages.

## COUNT VII

### STRICT PRODUCTS LIABILITY
### (Manufacturing Defect, Design Defect, and Failure to Warn)

### (brought by all Plaintiffs individually under the laws of their respective states)

123.     Plaintiffs reallege and incorporate herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further allege as follows.

124.     At all times herein mentioned, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Product used by Plaintiffs.

125.     Defendant caused Plaintiff minor children physical injury.

126.     Defendant is liable for defectively manufacturing the Products because Defendant's unwillingness or inability to ensure consistency in the amount of Ahcovel dispensed on the Products during their manufacture was the proximate cause of Plaintiff minor children's physical injuries.

127.     Defendant is liable for defectively designing the Products because it included Ahcovel in the design of the Products despite the fact that Defendant could not or would not properly regulate the quantity of Ahcovel being dispensed on the Products.

128.    Defendant had a duty to warn consumers about the risks and dangers of the Products because these risks and dangers go well beyond routine diaper rashes, given the kind of chemical burns that Ahcovel is liable to cause.

129.    Defendant failed in this duty.

130.    As a direct and proximate result of Defendant's defective manufacturing, defective design, and failure to warn, Plaintiff minor children suffered physical injury, which in turn caused their parents emotional injuries.

131.    Defendant's actions and omissions as identified in this Complaint show that Defendant acted maliciously and intentionally disregarded the rights of Plaintiffs, thus warranting the imposition of punitive damages.

## COUNT VIII

**NEGLIGENCE**
**(Manufacturing Defect, Design Defect, and Failure to Warn)**

**(brought by all Plaintiffs individually under the laws of their respective states)**

132.    Plaintiffs reallege and incorporate herein by reference the allegations contained in all the preceding paragraphs of this Complaint, as if fully set forth herein, and further allege as follows:

133.    At all times material hereto, Defendant designed and manufactured the Product.

134.    Defendant had a duty to exercise reasonable care in designing, manufacturing, assembling, marketing, selling and/or distributing the Product. Defendant placed the Product into the stream of commerce.  It had a duty to ensure that the Product would perform as intended and not create serious health risks to minor Plaintiffs.

135.    Defendant failed to exercise ordinary care in the designing, manufacturing, assembling, inspecting, marketing, selling and/or distributing the Product into the stream of commerce.  Defendant knew or should have known that the Product was manufactured without adequate safety precautions and that this created an unreasonable risk of serious injury to infants.

136.    The negligence of Defendant, its agents, servants, and/or employees, included, but was not limited to, the following acts and/or omissions:

   i.    manufacturing, marketing, and distributing the Product without adequately testing them for defects;

   ii.    failing to warn Plaintiffs, the public, and the medical and healthcare profession, of the dangers of the Product;

   iii.    failing to recall or otherwise notify users at the earliest date that it became known that the Product was dangerous and defective;

   iv.    representing that the Product was safe for its intended purpose when it is in fact unsafe;

137.    Defendant knew or should have known that consumers such as Plaintiffs would suffer foreseeable injury, or be at increased risk of injury, as a result of Defendant's failure to exercise ordinary care.

138.    Defendant's negligence was the proximate cause of minor Plaintiffs' physical injuries.

139.    Defendant's conduct as described herein, including but not limited to its failure to provide adequate warnings, and its continued manufacture, sale, and marketing of the Product, which it knew was dangerous, evidences intentional disregard for the rights of Plaintiffs and warrant the imposition of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated, seek judgment against Defendant, as follows:

a. An Order that this action be maintained as a class action, appointing Plaintiffs as representative of the Nationwide Class or, in the alternative, an order appointing Plaintiffs as representatives of their respective state classes;

b. An Order appointing the undersigned attorney as Class Counsel in this action;

c. Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d. All recoverable compensatory and other damages sustained by Plaintiff and Class members;

e. Actual and/or statutory damages for injuries suffered by Plaintiff and Class members in the maximum amount permitted by applicable law;

f. An order (i) requiring Defendant to immediately cease their wrongful conduct as set forth in this Complaint; (ii) ordering Defendant to engage in a corrective advertising campaign; and (iii) requiring Defendant to reimburse Plaintiff and all Class members, up to the amounts paid for the Products;

g. Statutory pre-judgment and post-judgment interest on any amounts;

h. Payment of reasonable attorneys' fees and costs; and

i. Such other relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demand a jury trial on all claims so triable.


Dated: December 6, 2022

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: _____/s/ *C.K. Lee*_____

C.K. Lee
148 W. 24th Street, Eighth Floor
New York, NY 10011
Telephone: (212) 465-1188
Facsimile: (212) 465-1181
*Attorneys for Plaintiffs and the Class*